## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DISCRETE HOLDINGS LLC,
c/o Bayan Towfiq,
3514 208th Pl NE
Sammamish, WA 98074,

SEAN HSIEH,
13636 3rd Ave NE
Seattle, WA 98125,

and

JORDAN LEVY,
3206 13th Ave W
Seattle, WA 98119

        Plaintiffs,

v.

INTRADO CORPORATION,
f/k/a WEST CORPORATION,
11808 Miracle Hills Drive,
Omaha, NE 68154,

        Defendant.

CIVIL ACTION No.

## **COMPLAINT**

1. This is a dispute involving over a half million dollars held in escrow in connection with a stock purchase agreement. Under the agreement, West Corporation purchased all of the issued and outstanding shares of capital stock of Flowroute, Inc. The escrow served as security for the indemnification obligations the sellers may owe to West Corporation. After the stock purchase closed, Intrado Corporation, as successor in interest to West Corporation, asserted various indemnification claims against the escrow. Sellers Discrete Holding LLC, Sean Hsieh, and Jordan Levy ("Plaintiffs") bring this action against Intrado Corporation to obtain a declaratory judgment

that will permit them to recover funds that are being held in escrow by the First National Bank of Omaha ("Bank") as the result of disputes arising from the Stock Purchase Agreement in which Plaintiffs sold Defendant stock in the company Flowroute.

**Parties**

2. Flowroute, Inc. ("Flowroute") is a Nevada corporation, which prior to the sale had its principal place of business in Seattle, Washington. Flowroute's shares of stock were sold to Defendant Intrado Corporation's predecessor, West Corporation.

3. Plaintiff Discrete Holdings LLC ("DH LLC") is a Nevada limited liability company that was a shareholder of Flowroute and had its principal place of business in Nevada. DH LLC is a single member company whose only member is a citizen of Washington State.

4. Plaintiff Sean Hsieh ("Hsieh") is a natural person domiciled in the state of Washington. Hsieh is a former shareholder of Flowroute.

5. Plaintiff Jordan Levy ("Levy") is a natural person domiciled in the state of Washington. Levy is a former shareholder of Flowroute.

6. Defendant Intrado Corporation ("Intrado") is, upon information and belief, a Delaware corporation with its principal place of business in Nebraska. Intrado is the successor in interest to West Corporation, the purchaser of the Flowroute stock in the subject Stock Purchase Agreement.

**Jurisdiction**

7. This Court has subject matter jurisdiction over the claims herein under 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000. No one Plaintiff is a citizen, incorporated, or has its principal place of business in the same state as the Defendant.

8. This Court has personal jurisdiction over all of the Parties, who are signatories to a Stock Purchase Agreement ("SPA") that establishes personal jurisdiction in this Court. Exhibit A at § 16.02.

9. Venue is proper in this District because all Parties have consented to venue in the State of Delaware pursuant to Paragraph 16.02 of the SPA. Exhibit A.

## FACTUAL ALLEGATIONS

10. Flowroute is a telecommunications company engaged in the business of public switched telephone network and session initiation protocol ("PSTN SIP") trunking, which involves the manner in which telephone calls are routed to a specific location.

11. Prior to the SPA executed by the Parties on June 28, 2018, Exhibit A, Flowroute was owned by the Plaintiffs. As a result of the SPA, Defendant Intrado (formerly known as West Corporation) purchased Flowroute effective August 15, 2018.

12. Exhibit A is a true and accurate copy of the SPA executed by Plaintiffs and Defendant.

### A. Applicable Terms of the Stock Purchase Agreement

13. As part of the SPA, the Plaintiffs set aside Three Million Six Hundred Twenty-Five Thousand Dollars ($3,625,000) of the purchase price into an escrow account to secure the obligations of the Plaintiffs to indemnify Defendant for "breaches of any representations, warranties, covenants, or obligations of any of [Flowroute] or the [Plaintiffs]." Exhibit A at § 2.02(b).

14. The Indemnification obligations of the Plaintiffs were enumerated in Section 11.01 of the SPA. Exhibit A at § 11.01, pp. 50-51.

15. Specifically, Plaintiffs indemnified Defendant in connection with or arising from

"any breach of any warranty or the inaccuracy of any representation contained in Article V of this Agreement or any other Transaction Document or any certification delivered by on behalf of the Company pursuant thereto." Exhibit A at §11.01(a)(i).

16. Among the other warranties and representations made by Plaintiffs in Article V was the following:

**Taxes.** Except as set forth in Schedule 5.19:

(a)(i) Since the formation of [Flowroute], the Company has filed or caused to be filed, when due, all Tax Returns required by applicable Law to be filed by it; . . . (iii) the Company has paid all Taxes owed by it (whether or not shown on any Tax Return); [and] (iv) any unpaid liability of the Company for Taxes (other than any liability of the Company being contested in good faith) not due and payable as of the Closing Date will be reflected as a liability in the calculation of Working Capital) . . .

Exhibit A at § 5.19.

17. Under the SPA, the word "Tax" and, with correlative meaning, "Taxes," means

Any and all federal, state, and local taxes, fees, and any and all levies, impositions, and other charges of similar kind (together with any and all interest, penalties, additions to tax, assessments and additional amounts imposed with respect thereto), including taxes or other charges on or with respect to income and franchise, windfall, or other profits, gross receipts, property, sales, use, capital stock, payroll, employment, social security, workers' compensation, unclaimed property, unemployment compensation, or net worth; takes or other charges in the nature of excise, withholding, ad valorem, stamp, transfer, value-added, goods and services, and capital gains taxes; universal service fund and other charges levied by the Federal Communications Commission, state public utility commissions, or public and private entities performing similar functions; license, registration, and documentation fees; escheat, abandonment and unclaimed property amounts; and customs duties, tariffs, and other similar charges and any other regulatory fees or assessments.

Exhibit A at § 1.01, p. 10.

18. Under the SPA, the Parties agreed that Plaintiffs "shall have no liability under Section 11.01(a)(ii) until the total of all Losses incurred by the [Defendant] with respect to such matters exceeds Two Hundred Thousand Dollars ($200,000), in which event the Sellers [Plaintiffs]

4

shall be required to pay or be liable for all such Losses[1] from the first dollar." Exhibit A at § 11.01(e).

19. In addition, the Plaintiffs agreed to indemnify Defendant in connection or arising from:

> Any and all Taxes (whether assessed or unassessed and together with any costs and expenses relating thereto) applicable to the Business and/or the Company, including as a result of being, prior to the Closing Date, a member of any consolidated, combined, affiliated, unitary or similar group with which the Company filed or was required to file a Tax Return on a consolidated, combined, unitary, affiliated or similar basis (including any Taxes imposed pursuant to Treasury Regulation Section 1.1502-6 or a similar provision of any state, local or foreign Tax Law), in each case attributable to taxable years or periods (or portions thereof) ending on or prior to the Closing Date, and with respect to any Straddle Period, the portion of each Straddle Period ending on the Closing Date.

Exhibit A at § 11.01(a)(v).

20. The indemnifications provided in Article XI of the SPA expired eighteen months after the Closing Date. Exhibit A at § 11.02(d).

21. Under the Escrow Agreement established under the SPA, the Escrow Agents (the Bank) shall invest escrow amounts in eligible investments. SPA at Exhibit A.

22. If either Party to the SPA sought indemnification thereunder, that party shall promptly give the other party a notice "describing in reasonable detail the facts giving rise to any claim for indemnification." *Id.* at § 11.03(a).

23. If either Party to the SPA sought indemnification thereunder, "the amount of indemnification to which an Indemnified Party shall be entitled . . . shall be determined by:" 1) mutual written agreement; 2) "by a final judgment or decree of any court of competent

---

[1] "Loss" and "Losses" under the Agreement was defined to mean any and all losses, costs, obligations, liabilities, settlement payments, awards, judgments, fines, penalties, damages, deficiencies, or other charges and Expenses (to the extent that the Expenses arise from a matter for which indemnification is required hereunder).

jurisdiction;" or 3) by any other means agreed to by the parties in writing. *Id.* at § 11.03(b). "The judgment or decree of a court shall be deemed final when the time for appeal, if any, shall have expired and no appeal shall have been taken or when all appeals shall have been finally determined." *Id.*

24. Further, the SPA limited the remedies of Defendant after closing to those remedies set forth in Article XI of the SPA. *Id.* at § 11.05.

25. Pursuant to the SPA, the "Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Delaware, without giving effect to the conflict or choice of law rules thereof." Exhibit A at § 16.02.

26. The Closing Date of the SPA was August 15, 2018.

**B. Defendant's Notice of Claim for Indemnification**

27. On November 19, 2020, Counsel for Defendant submitted a "Notice of Claim for Indemnification" to Bayan Towfiq, Plaintiffs' (Sellers') Representative, asserting a claim "based upon unpaid pre-Closing fees owed to the Universal Service Fund, or USF," Exhibit B at p. 1.

28. Exhibit B is a true and accurate copy of the "Notice of Claim indemnification" sent by Defendant's Counsel to Mr. Towfiq.

29. Defendant asserted a claim totaling $560,203.78, which Defendant conceded were not accounted for on the Company's balance sheet as of the Closing Date. Exhibit B at pp. 1, 2. Attached to the Notice were documents purporting to evidence the payments. *Id.* at pp. 4-13.

30. Defendant claimed such Taxes pursuant to Section 11.01(a)(v) of the SPA, acknowledging that Section 11.01(a)(ii) also applied to the claim, *Id.* at 2.[2] As a result of

---

[2] Defendant later changed its position, claiming that it was seeking indemnification under both Section 11.01(a)(ii) and Section 11.01(a)(v). Exhibit C at ¶ 1.

Defendant's purported "choice" of invoking Section 11.01(a)(v), Defendant asserted that the "tipping basket" of Section 11.01(e) did not apply to the purported indemnification.  *Id.*

31. Exhibit C is a true and accurate copy of an electronic mail message from Defendant's Counsel to Counsel for Plaintiffs dated September 7, 2021 containing a "supplemental outline of Intrado's legal position on the Escrow Claim noticed 11/19/20."

### C. Plaintiff's Response to Notice of Indemnification

32. On January 11, 2021, Counsel for Mr. Towfiq responded to this "Notice of Indemnification" explaining that Defendant's claim "reflect[ed] a misunderstanding of the Federal Communications Commission's ("FCC" or "Commission") annual regulatory fee, Telecommunications Relay Service ("TRS") fund, and Universal Service Fund ("USF") charges." Exhibit D at 1.

33. Exhibit D is a true and accurate copy of a letter sent from Counsel for Plaintiffs to Defendant's Counsel on January 11, 2021.

34. As the response explained, "[w]hen properly calculated, the maximum potential Escrow Claim based on the information provided in the Letter is $128,863.76."

35. The Response further pointed out that "Exhibit A of the Letter provides insufficient information to fully evaluate some of the claims, and those claims could very well be less than the maximum claim amount" and Section 11.01(e)'s "tipping basket" still applies to Defendant's escrow claim.  As a result, "[b]ecause the Escrow Claim is less than the $200,000 trigger for the tipping basket, the Sellers and Mr. Towfiq have no liability to Intrado under the SPA." Exhibit D at 1.

### D. "Taxes" at Issue

#### a. FCC Regulatory Fees

36.     Annual regulatory fees are mandated by Congress, pursuant to Section 9 of the Communications Act of 1934, as amended. Section 9 requires the FCC to collect regulatory fees to recover the regulatory costs associated with its enforcement, policy and rulemaking, user information, and international activities. Regulatory fees are distinct from application fees, which are authorized in 47 U.S.C. §158. Application fees cover the FCC's costs related to licensing communication service providers. This includes activities such as issuing permits, testing applicants, certifying licenses, authorizing transfers, assigning or transferring call signs, and adjudicating disagreements.   https://www.fcc.gov/licensing-databases/fees/regulatory-fees (accessed on October 11, 2021).

37.     The FCC calculates its annual Regulatory Fee to assess and collect funds for its operations during its fiscal year. The FCC fiscal year runs from October 1 to September 30 of the following year. The fee is assessed when the FCC adopts its annual Regulatory Fee report and order, and as the 2018 and 2019 Regulatory Fee orders make clear, the fee obligation applies to the entity providing a feeable service as of the payment due date. In fact, FCC regulated entities cannot pay the regulatory fee until after the FCC adopts the report and order assessing the fee, and such entities would have no way of calculating the fee prior to the release of the FCC's annual Regulatory Fee report and order.

38.     In 2018, the FCC adopted its annual Regulatory Fee on August 29, 2018. *In re Assessment and Collection of Regulatory Fees for Fiscal Year 2018*, Report and Order and Order, 33 FCC Rcd. 8497 (2018).

39.     The 2019 Regulatory Fee was adopted on August 15, 2019. *In re Assessment and*

*Collection of Regulatory Fees for Fiscal Year 2019*, Report and Order and Further Notice of Proposed Rulemaking, 34 FCC Rcd. 8189 (2019).

40. The 2018 and 2019 FCC Regulatory Fee orders were released on August 29, 2018 and August 15, 2019, respectively. The 2018 Regulatory Fees was due September 27, 2018, and the 2019 fee was due September 27, 2019.

### b. Telecommunications Relay Service ("TRS") fund

41. The Telecommunications Relay Service ("TRS") allows persons with hearing or speech disabilities to place and receive telephone calls. TRS is available in all fifty states, the District of Columbia, Puerto Rico and the U.S. territories for local and/or long-distance calls. TRS relies on communications assistants ("CA") to relay the content of calls between users of text telephones ("TTY"s) and users of traditional handsets (voice users). For example, a TTY user may telephone a voice user by calling a TRS provider (or "relay center"), where a CA will place the call to the voice user and relay the conversation by transcribing spoken content for the TTY user and reading text aloud for the voice user. https://transition.fcc.gov/Bureaus/Common_Carrier/FAQ/faq_trs.html (accessed on November 3, 2021).

42. Costs for interstate TRS (that is, TRS calls that cross state lines) are paid through the Interstate TRS Fund, a shared-funding mechanism that is funded by contributions from all interstate carriers in the United States. The Interstate TRS Fund is currently administered by the National Exchange Carrier Association (NECA). *Id.*

43. The TRS funding year begins on July 1 and runs through June 30 of the following calendar year. While the contribution for the 2018-2019 TRS funding year amount is calculated based on information provided in the 2018 Form 499-A reporting 2017 annual revenue, the TRS

contribution did not apply to Flowroute until it was invoiced by the TRS Fund administrator during the 2018-2019 funding year.

44. The FCC did not adopt the 2018-2019 TRS contribution factor until June 29, 2018. *See In re Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities; Structure and Practices of the Video Relay Service Program*, Order, 33 FCC Rcd. 6300 (2018) ("2018-19 TRS Funding Year Order"). As the 2018-19 TRS Funding Year Order makes clear, the order establishes the size of the TRS Fund and the contribution factor to support it beginning July 1, 2018 and ending June 30, 2019. *Id.*

### c. FCC's Universal Service Fund "True-up" Fees

45. The Universal Service Fund ("USF") fee is a fee imposed on providers of telecommunications based of an assessment on their interstate and international end-user revenues to provide access to communications services, including high-speed internet, to all Americans including remote rural areas, low-income consumers including initiatives to expand services for residents of tribal lands, schools and libraries, and rural health care facilities. The Universal Service Administrative Company ("USAC") administers the programs and collects monies for the USF under the direction of the FCC. https://www.fcc.gov/general/universal-service (accessed on November 3, 2021).

46. The annual true-up is the reconciliation of the previous calendar year's fee. USAC uses data collected on the FCC Form 499-A (Annual Telecommunications Reporting Worksheet) and compares it to the projected collected end-user revenue that was reported in the quarterly FCC Form 499-Q filings. For example, the 2021 FCC Form 499-A filing is used to reconcile calendar year 2020. https://www.usac.org/service-providers/making-payments/annual-true-up-process/ (accessed on November 3, 2021).

### E. Unresolved Dispute Regarding Defendant's Claim for Indemnification

47. Defendant has refused to concede that Plaintiffs do not owe the amounts demanded in Defendant's "Notice of Indemnification" and, as a result, the Bank has refused to release the escrow funds in the amount of $560,203.78 to which Plaintiffs are entitled.

### FIRST CAUSE OF ACTION
*Declaratory Judgment*

48. Plaintiffs repeat and incorporate by reference all other paragraphs in the Complaint.

49. Pursuant to 28 U.S.C. § 2201(a), this Court, "[i]n a case of actual controversy within its jurisdiction, . . . upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

50. Any such declaration from this Court shall have the force and effect of a final judgment or decree and shall be reviewable as such. *Id.*

51. The dispute between Plaintiffs and Defendant regarding whether Defendant is entitled to indemnification for the claims that it asserts is an "actual controversy within [the] jurisdiction" of this Court.

52. Pursuant to the SPA, this Court has personal and subject matter jurisdiction over this matter. Exhibit A at § 16.02.

53. In the SPA, the Parties have agreed that, in absence of a written agreement as to the disbursement of the contested escrow funds or a written agreement as to an alternative means of adjudication, this matter can be resolved by a final judgment or decree of any court of competent jurisdiction. Exhibit A at § 11.03(b).

54. The Parties have not entered into any written agreement resolving this dispute nor have they entered into any written agreement identifying any alternative means of dispute

resolution.

55.     Under the SPA, this Court is a "court of competent jurisdiction." Exhibit A at § 16.02.

56.     Plaintiffs are entitled to disbursement of the escrow funds in whole or part for several reasons:

   a. Defendant failed to provide notice of its claim for indemnification within eighteen (18) months after the Closing Date;

   b. Defendant has not provided sufficient information to support any alleged claim for indemnification;

   c. SPA Section 11.01(e)'s "tipping basket" prevents an indemnification because any such claim, to the extent that it may be legitimate, is less than $200,000;

   d. Defendant is not entitled to any indemnification for the FCC Regulatory Fees sought by Defendant, for the reasons set forth in Exhibit D;

   e. Most of the TRS Fund fees sought by Defendant are not recoverable from Plaintiffs and to the extent that any such fees are recoverable, they are less than the Section 11.01(e) "tipping basket," as explained further in Exhibit D;

   f. The information provided by Defendant is insufficient to support its escrow claim for its request for indemnification for the USF "true-up" claim and Defendant has refused to provide any additional information.

57.     By reason of the refusal of Defendant to release the funds held in escrow by the Bank, Plaintiffs have sustained a continuing injury in the amount of $560,203.78 plus any earnings from investments made from this escrow account.

58.     By reason of the facts set forth in this Complaint, Plaintiffs are entitled to a

Declaratory Judgment that they are entitled to the release of the escrow held by the Bank in the amount of $560,203.78 plus any earnings from investments made from this escrow account.

## **PRAYER FOR RELIEF**

1. WHEREFORE Plaintiffs pray that a declaratory judgment be entered in their favor holding that the escrow funds held by the Bank should be released into their favor;

2. Any earnings from the escrow funds (prior to resolution of this dispute and distribution of these funds to Plaintiffs) should be released to Plaintiffs; and

3. All other damages and other or further relief as this Court may deem just and proper.


DATED: November 23, 2021    Respectfully submitted,

GELLERT SCALI BUSENKELL & BROWN, LLC

*/s/ Margaret F. England*
Margaret F. England (DE 4248)
1201 N. Orange Street, Suite 300
Wilmington, Delaware 19801
Telephone: (302) 416-3341
Facsimile: (302) 425-5814
mengland@gsbblaw.com

Tony S. Lee (*pro hac vice* pending)
Thomas F. Urban II (*pro hac vice* pending)
Seth L. Williams (*pro hac vice* pending)
FLETCHER, HEALD & HILDRETH, PLC
1300 N. 17TH Street, Suite 1100
Arlington, Virginia 22209
(703) 861-5235 – Tel.
lee@fhhlaw.com
urban@fhhlaw.com
williams@fhhlaw.com

*Counsel for Plaintiffs*